FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 06, 2026

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JAMES T.,[1] <br><br> Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO, <br> Commissioner of Social Security, <br><br> Defendant. | No.   1:26-cv-3004-EFS <br><br><br> **ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR MORE PROCEEDINGS** |

Plaintiff James T. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 2 and 16 benefits. Plaintiff claims he is unable to work due primarily to chronic heart failure and mental

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." See LCivR 5.2(c).

DISPOSITIVE ORDER - 1

disorders. The ALJ did not err in concluding that Plaintiff's heart condition did not meet or medically equal the listing for chronic heart failure, but substantial evidence does not support the ALJ's evaluation of the mental-health opinions. Accordingly, the ALJ's decision is reversed, and this matter is remanded for further proceedings.

## I.    Background

Plaintiff filed his first Title 16 application for benefits on February 7, 2019.[2] In September 2023, the district court remanded the denial of that application.[3] On remand, the Appeals Council consolidated Plaintiff's application with subsequent Title 2 and Title 16 applications filed on September 27, 2021.[4]

---

[2] Administrative Record (AR) 223.

[3] AR 888–905. E.D. Wash. Case No. 1:21-cv-3107-RHW.

[4] AR 1161, 1688, 1695. The ALJ's decision therefore evaluated disability dating back to February 7, 2019, the start of the Title 16 period, and the substantive analysis was unchanged by the Title 2 period beginning in September 2021. Accordingly, for clarity and succinctness, the Court herein refers and cites to the regulations

DISPOSITIVE ORDER - 2

ALJ Deborah Van Vleck held three hearings on Plaintiff's applications post-remand, and a different ALJ held Plaintiff's first hearing pre-remand.[5] At the pre-remand hearing in December 2020, Plaintiff testified that he frequently became frustrated or enraged by other employees he worked with at past jobs.[6] He lost a prior job because he responded angrily to a customer.[7] He believed he could work if he was always by himself.[8] He testified that some days his depression would be so severe that he would sleep up to 18 hours a day, and though he improved since starting medication, he still experienced

applicable to Title 16 claims, and the relevant Title 2 counterparts are substantively identical.

[5] AR 83–111 (December 2020 pre-remand hearing), 735–79 (May 2024 post-remand hearing), 780–826 (February 2025 hearing, convened for medical-expert testimony), 827–61 (March 2025 hearing, convened due to technical issues at February 2025 hearing).

[6] AR 93–96, 98

[7] AR 93.

[8] AR 100–01.

DISPOSITIVE ORDER - 3

days of not wanting to do anything and staying in bed.[9] He also still experienced cycles of rage.[10]

On appeal from the ultimate nondisability determination, the court in September 2023 remanded because the ALJ failed to sufficiently develop the record of Plaintiff's cardiovascular impairments and unreasonably evaluated the psychological evaluating opinion of Patrick Metoyer, PhD, by relying only on normal findings when the record showed mixed findings and evidence of PTSD, mood imbalance, rage, and frequent conflicts.[11] The court instructed the ALJ to update the record with medical expert testimony and reevaluate all evidence.[12]

At the first post-remand hearing in May 2024, Plaintiff testified that he had been walking a mile almost every day over the past month.[13] He had to climb approximately 12 steps to get to his

---

[9] AR 101–03.

[10] AR 735–79.

[11] E.D. Wash. Case No. 1:21-cv-3107-RHW, ECF Nos. 19, 23.

[12] E.D. Wash. Case No. 1:21-cv-3107-RHW, ECF Nos. 19, 23.

[13] AR 746.

DISPOSITIVE ORDER - 4

apartment.[14] He did not have physical issues moving around his apartment or going out, but sometimes he had low motivation preventing him from leaving his apartment.[15] He believed the stress of dangerous situations from his Navy service caused his mental illness.[16] He had done limited volunteer work at church that did not involve a lot of heavy lifting.[17] He was able to get out of bed, bathe, dress, and use the toilet without assistance.[18] He did his own grocery shopping and did household chores like cleaning and mopping for an hour or two while taking breaks.[19] At least once a month, he attended wrestling matches with a friend, which lasted three hours.[20] He spent about ten

---

[14] AR 749.

[15] AR 750.

[16] AR 752.

[17] AR 753–54.

[18] AR 761.

[19] AR 761, 769.

[20] AR 763.

DISPOSITIVE ORDER - 5

hours a week making graphic art.[21] He described his average day as he woke up around 11:00 a.m., tried to walk, drew while watching TV, sat on his couch playing video games, took a nap for a few hours in the afternoon, and went to bed at 11:00 p.m.[22] Usually he walked up to a mile or a mile and a half, but some days he could not due to lack of motivation, stress, or cramps and pain.[23] His primary mental-health problems were depression and anxiety.[24] Crowds, "too many things going," "events," or "occasions" made his anxiety worse.[25] His medication "t[ook] the edge off" and was 7/10 effective.[26] He had been seeing a mental-health counselor, Greg Hires, for the past six years.[27]

---

[21] AR 764.

[22] AR 765.

[23] AR 766–67.

[24] AR 767.

[25] AR 767.

[26] AR 768.

[27] AR 770.

DISPOSITIVE ORDER - 6

At the hearing in February 2025, Plaintiff testified again that he could perform household chores mostly without issue and walk up the stairs to his apartment.[28] He explained that he helped his friend set up wrestling shows; he used to help assemble the ring but stopped when his health faded in 2023, but he still helped out when he could approximately once a month and was a timekeeper.[29] He walked three times a week but became winded after a block; he would start running and have trouble catching his breath, but he would keep going and then sit down when he returned to his apartment.[30] He had been seeing his mental-health counselor, Mr. Hires, twice a week for the past five or six years.[31] Counseling was helpful because he learned techniques to control his "mental condition" and depression.[32] He was "no longer sleeping all day" or staying in his room all day because his

---

[28] AR 792.

[29] AR 797–98.

[30] AR 800–01.

[31] AR 817–18.

[32] AR 818.

DISPOSITIVE ORDER - 7

counselor helped him "understand what [he had been] going through and helping [him] . . . get out of the room and move around."[33] He was taking antidepressant and mood-leveling medication.[34] He was never hospitalized or in inpatient care for mental health.[35]

Plaintiff then testified to having "manic episodes" from "time to time," saying:

> I'll get really excited or I'll get really angry or I'll get particularly suicidal. That happened a few months ago when I basically challenged a neighbor to shoot me, to prove a point. I have talked to my therapist about that and that's happened at least one other time since then.[36]

He had one major episode in 2024 and other "light episodes" where he would get agitated by what he saw on TV or Facebook.[37] He had an incident with his neighbor where he kicked garbage off his stairs, "challenged [a] kid by saying, what you going to do about it," "there

---

[33] AR 818–19.

[34] AR 819–20.

[35] AR 820.

[36] AR 821.

[37] AR 823.

DISPOSITIVE ORDER - 8

w[ere] shouting matches, there was near violence," and Plaintiff asked if he had a gun.[38] Plaintiff's wife had to resolve the situation and it "took her a bit to calm [him] down."[39]

Beverly Yamour, MD, FACC, a medical expert, testified that Plaintiff had a history of treatment for congestive heart failure that had improved overall based mostly on clinical heart monitoring signs and his reported physical exercise capabilities.[40]

At the final hearing in March 2025, Plaintiff testified again that he could do household chores mostly without issue.[41] He could not get out of bed all day because of feeling down about three or four days a month.[42] He had one friend whom he occasionally spent time with playing games and going to his wrestling shows.[43] He and his wife went

---

[38] AR 824.

[39] AR 824–25.

[40] AR 803–08, 810–11, 813–14.

[41] AR 833–35, 837, 842–43.

[42] AR 833–34.

[43] AR 835.

DISPOSITIVE ORDER - 9

out to restaurants at least every other month.[44] He spent several hours of the day drawing.[45] He collected figurines and went to a hobby shop twice a month for up to 30 minutes.[46] He described his typical day in primarily the same way as he did at the prior hearing.[47] A vocational expert testified that a hypothetical individual of Plaintiff's age, education, and work history, who had certain physical limitations, could person simple tasks and deal with changes in that type of work setting, and have only occasional interaction with the public, could work as a mail room clerk, office helper, or laundry folder, which were "light, unskilled" jobs.[48] The same individual could also perform the "sedentary, unskilled" jobs of credit clerk or charge-account clerk because those jobs do not involve much customer contact anymore.[49]

---

[44] AR 837.

[45] AR 837–38.

[46] AR 838–39.

[47] AR 839.

[48] AR 847–48.

[49] AR 848.

DISPOSITIVE ORDER - 10

The individual could perform those same jobs if he was also limited to occasional interaction with supervisors and co-workers.[50] Those jobs would have no tolerance for more than 15% off-task time, more than one absence per month, or frequent breaks.[51]

The ALJ issued a decision finding Plaintiff not disabled.[52] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent" with the medical evidence and other evidence.[53] As to the medical opinions, the ALJ found:

- the reviewing physical-health opinions of Merry Alto, MD, and Norman Staley, MD, "generally persuasive," except Dr. Alto's "nonsevere findings" were not persuasive.

---

[50] AR 849.

[51] AR 851–52.

[52] AR 691–716. Per 20 C.F.R. § 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[53] AR 703. As recommended by the Ninth Circuit in *Smartt v. Kijakazi*, the ALJ should consider replacing the phrase "not entirely consistent" with "inconsistent." 53 F.4th 489, 499 n.2 (9th Cir. 2022).

DISPOSITIVE ORDER - 11

- the reviewing mental-health opinions of Steven Haney, MD, and Michael L. Brown, PhD, "somewhat persuasive to the extent the claimant has a severe mental impairment."

- the ophthalmology portions of the reviewing opinions of Robert Hander, MD, and Glenn Gade, MD, persuasive, and the physical-health portions "somewhat persuasive."

- the reviewing opinion of psychological consultant Janis K. Lewis, PhD, "somewhat persuasive to the extent the claimant has only mild limitations in most areas of mental functioning," and the reviewing opinion of psychological consultant John Gilbert, PhD, persuasive.

- the testifying opinion of medical expert Beverly Yamour, MD, FACC, persuasive, except Plaintiff would not need to change position more frequently than normal work breaks.

- the mental-health examining opinion of Patrick Metoyer, PhD, not persuasive, and the mental-health examining opinion of Jole C. Mitchell, PhD, "partially persuasive."

DISPOSITIVE ORDER - 12

- the "moderate and marked limitations" portions of the psychological-evaluation opinion of Thomas Genthe, PhD, not persuasive.

- the physical-health examining opinions of Lisa Benton, ARNP, and William Drenguis, MD, "somewhat persuasive," and the physical-health examining opinion of Si Feng, ARNP, "generally persuasive."

- the provider statements of Gregg Hires, LICSW, to the extent they are opinions, not persuasive.[54]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since February 7, 2019, the application date.

- Step two: Plaintiff had the following medically determinable severe impairments: aggravating type II diabetes mellitus; degenerative disc disease of the lumbar spine; "a cardiac impairment diagnosed to include nonischemic cardiomyopathy and chronic systolic congestive heart failure"; and "a mental

---

[54] AR 705–13.

DISPOSITIVE ORDER - 13

impairment variously diagnosed as major depressive disorder, generalized anxiety disorder, and PTSD (post-traumatic stress disorder)."

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the following RFC:

   to perform light work as defined in 20 CFR 416.967(b) lifting and carrying 20 pounds occasionally and 10 pounds frequently; can push and/or pull including operation of hand and foot controls within the lifting and carrying restriction of light work; can occasionally reach overhead bilaterally and frequently reach in other directions bilaterally; can frequently handle bilaterally; can frequently finger bilaterally; can occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds; no limitation on balance but can frequently stoop, kneel, and crouch; never crawl; can never work in the presence of unprotected heights or machinery; should not be required to operate a motor vehicle as part of the job duties; never work in the presence of concentrated exposure to dust, odors, fumes, and pulmonary irritants; never work in the presence of concentrated exposure to cold, heat, or humidity; is able to perform simple and routine tasks and can use judgment for that type of work, and can deal with changes in a work setting consistent with that type of work; should have no more than occasional interaction with the public, coworkers, and supervisors.

- Step four: Plaintiff had no past relevant work.

DISPOSITIVE ORDER - 14

- • Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as mail room clerk, office helper, and laundry folder.[55]

Plaintiff filed written exceptions to the ALJ's decision with the Appeals Council, which declined to assume jurisdiction, rendering the ALJ's decision final.[56] Plaintiff now appeals to district court.[57]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error"[58] and such error impacted the nondisability determination.[59] Substantial evidence is

---

[55] AR 697–716.

[56] AR 684–85. *See* 20 C.F.R. § 416.1484.

[57] ECF No. 1.

[58] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[59] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may

DISPOSITIVE ORDER - 15

"more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

### III.    Analysis

Plaintiff argues the ALJ erred at step three and when determining the RFC for purposes of steps four and five. The Commissioner argues the ALJ followed the correct legal standards and substantial evidence supports the RFC and her finding that Plaintiff did not meet a listing.

### A.    Step Three (Listings): Plaintiff fails to establish error.

Plaintiff contends the ALJ erred at step three by improperly evaluating whether Plaintiff's medical conditions met or medically equaled listing 4.02, the listing for chronic heart failure, which contains two subsections that must be satisfied, A and B. Plaintiff asserts that the ALJ did not make specific findings whether Plaintiff met subsection A, which he contends is itself reversible error. Plaintiff

not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

DISPOSITIVE ORDER - 16

also asserts that substantial evidence does not support the ALJ's finding that he did not meet subsection B because the ALJ relied only on his testimony that he could shop and do chores. Lastly, Plaintiff contends that he meets subsection B because he is more seriously limited in his activities than the ALJ found and Plaintiff's implanted cardiac defibrillator poses a significant risk to exercise testing. As is explained below, substantial evidence supports the ALJ's finding that Plaintiff did not meet listing 4.02.

### 1.    Standard

At step three, if a claimant meets all of the listing criteria or if his impairments medically equal a listed impairment, he is considered disabled.[60] Medical equivalence will be found if the medical findings are at least of equal medical significance to the required criteria.[61] The

---

[60] *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (requiring a claimant to show that the impairment meets (or medically equals) all of the specified medical criteria, not just some of the criteria).

[61]  20 C.F.R. § 416.926(b)(3); *Marcia v. Sullivan*, 900 F.2d 172, 175 (9th Cir. 1990).

DISPOSITIVE ORDER - 17

ALJ is obligated to consider the relevant evidence to determine whether a claimant's impairments meet or equal one of the specified impairments set forth in the listings.[62] The ALJ need not recite the reasons for her step-three determination under the listings portion of the decision so long as the relevant evidence and underlying findings are discussed in the ALJ's decision.[63]

2.    Listing 4.02, Chronic Heart Failure

Listing 4.02 is the listing for chronic heart failure:

4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

---

[62] *Lewis v. Apfel,* 236 F.3d 503, 512 (9th Cir. 2001); 20 C.F.R. § 416.920(a)(4)(iii).

[63] *Lewis,* 236 F.3d at 513.

DISPOSITIVE ORDER - 18

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

DISPOSITIVE ORDER - 19

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.[64]

### 3. ALJ's Findings

The ALJ began her relevant step-three findings:

Consistent with findings of the State agency medical consultants and the medical expert, the undersigned finds the claimant's heart condition does not meet the criteria of listing 4.02, *Chronic Heart Failure*, because he does not have systolic or diastolic failure resulting in 1) persistent symptoms of heart failure which very seriously limit his ability to actively initiate, sustain, or complete activities of daily living; 2) three or more separate episodes of acute congestive heart failure within a consecutive 12-month period; or 3) an inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less. The

---

[64] 20 C.F.R. pt. 404, subpt. P, App. 1.

DISPOSITIVE ORDER - 20

claimant testified he can shop for groceries and do household chores.[65]

The ALJ next acknowledged Plaintiff's arguments that he met 4.02(A) because of his ejection fraction and diastolic dimensions and met 4.02(B)(1) because performing an exercise test would pose a significant risk to him due to his implanted cardiac defibrillator preventing the SSA from purchasing an exercise test.[66] The ALJ addressed the 4.02(B)(1) argument only, finding:

> the guidance does not state that the presence of [an implanted cardiac defibrillator] will result in a finding that the listing is met. Furthermore, the section also states, "[w]e will not purchase an exercise test when we can make our determination or decision based on the evidence we already have." Section 4.00(C)(6)(b). The State agency medical consultants and the medical expert have determined that the claimant's cardiac impairment does not meet a listing.[67]

The ALJ explained that the medical expert Dr. Yamour testified at the February 2025 hearing that Plaintiff did not meet the listing.[68]

---

[65] AR 699–700.

[66] AR 700.

[67] AR 700 (footnote omitted) (second alteration in original).

[68] AR 700 n.3.

4.    Analysis

First, the ALJ did not commit reversible error by not explicitly stating in the step-three section of her decision whether Plaintiff met listing 4.02(A). The ALJ explained later in her decision that Dr. Yamour persuasively testified that Plaintiff met the 4.02(A) criteria.[69] Moreover, to satisfy the listing, Plaintiff had to meet both subsections A and B, so finding the B criteria were not met without addressing the A criteria would support finding the listing overall was not met.

Second, substantial evidence supports the ALJ's finding that Plaintiff's symptoms of heart failure did not "very seriously limit his ability to actively initiate, sustain, or complete activities of daily living" under listing 4.02(B)(1). If, as Plaintiff suggests, "[t]he claimant testified he can shop for groceries and do household chores" was the ALJ's only reasoning, then substantial evidence would be lacking. But the ALJ went further. In the next paragraph, the ALJ credited Dr. Yamour's hearing testimony that Plaintiff did not meet the listing,

---

[69] AR 708.

DISPOSITIVE ORDER - 22

and Dr. Yamour's testimony is itself supported by substantial evidence.[70] Dr. Yamour testified, with citations to the record, that Plaintiff did not have persistent symptoms that interfered with his activities of daily living under listing 4.02(B)(1) because (1) in November 2019, Plaintiff reported to a consulting examiner going down the stairs from his third-floor apartment several times a day; (2) in February 2021, Plaintiff reported to a provider being able to walk up one flight of stairs without stopping and would get winded only after climbing three flights; (3) in September 2024, a consulting examiner opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, and could stand and walk for up to 6 hours in an 8-hour workday; and (4) in September 2024, Plaintiff reported to a provider being able to walk through the fair without difficulty and said he may try to walk a mile twice a week.[71] Additionally, throughout her decision, the ALJ accurately described records of Plaintiff's reported abilities to perform several activities of daily living beyond shopping

---

[70] AR 700.

[71] AR 806–07, 813–14 (citing AR 2872, 3459, 4003, 4052–53).

DISPOSITIVE ORDER - 23

and chores that can be applied to listing 4.02(B)(1), such as preparing meals, going to wrestling shows where he worked as a timekeeper or helper, making graphic art, working out, and caring for the yard.[72]

Third, substantial evidence supports the ALJ's finding that Plaintiff's implanted cardiac defibrillator did not result in him meeting listing 4.02. Listing 4.00 provides guidance for the listed cardiovascular-system impairments.[73] It provides that the SSA "will not purchase an exercise test when a[] [medical consultant] finds that you have . . . [a]n implanted cardiac defibrillator," which is a "significant risk factor."[74] It also provides that the SSA "will not purchase an exercise test when we can make our determination or decision based on the evidence we already have."[75] So, by regulation, Plaintiff's implanted cardiac defibrillator is a significant risk factor

---

[72] AR 698, 700–01, 709–10 (citing AR 2807, 2815, 3073, 3083, 3648, 3767).

[73] *See* 20 C.F.R. pt 404, subpt. P, App. 1, Listing 4.00.

[74] *Id.*, Listing 4.00(C)(8)(a)(iii).

[75] *Id.*, Listing 4.00(C)(6)(b).

DISPOSITIVE ORDER - 24

precluding the SSA from purchasing an exercise test which could support finding Plaintiff met listing 4.02(B)(3). But no medical consultant "concluded that the performance of an exercise test would present a significant risk to the individual" to satisfy listing 4.02(B)(1). To the contrary, at the February 2025 hearing, Plaintiff's representative asked Dr. Yamour if Plaintiff's implanted cardiac defibrillator would pose a risk to him if he underwent an exercise treadmill test, and Dr. Yamour responded, "Not at all. . . . It's his guardian. . . . It won't interfere . . . with the exercise tests at all."[76] And the ALJ correctly observed that she could decide listing 4.02 without ordering an exercise test if the record supported it, which, as explained above, the record did.

**B.    Medical Opinions: Plaintiff establishes consequential error.**

Plaintiff argues that substantial evidence does not support the ALJ's evaluation of opinions from three psychological examiners and Plaintiff's therapist. Plaintiff contends that all these sources opined

---

[76] AR 811.

DISPOSITIVE ORDER - 25

that Plaintiff was more mentally limited than the ALJ found and the normal mental-status findings and his daily activities do not constitute substantial evidence to discount them as inconsistent with the record. For the following reasons, the Court agrees, and remand is necessary because the ALJ's errors impacted the RFC determination.

### 1.    Standard

The ALJ must consider and articulate how persuasive she found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[77] The factors for evaluating the persuasiveness of medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[78] Supportability and consistency are the most important factors.[79] When considering the ALJ's findings, the Court is

---

[77] 20 C.F.R. § 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[78] 20 C.F.R. § 416.920c(c)(1)–(5).

[79] *Id.* § 416.920c(b)(2).

constrained to the reasons and supporting explanation offered by the ALJ.[80]

### 2.    Patrick Metoyer, PhD

On July 26, 2019, Dr. Metoyer performed a psychological evaluation of Plaintiff.[81] Dr. Metoyer diagnosed Plaintiff with generalized anxiety disorder, PTSD, and major depressive disorder, recurrent and moderate.[82] Dr. Metoyer opined that Plaintiff was moderately limited in the following activities: to interact with coworkers and the public; to maintain regular attendance; and to complete a normal workday or workweek without interruption from anxiety, PTSD, and mood symptoms.[83] Dr. Metoyer opined that Plaintiff was markedly impaired in his ability to deal with the usual

---

[80] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[81] AR 411–15.

[82] AR 415.

[83] AR 415.

DISPOSITIVE ORDER - 27

stress encountered in the workplace "as it involves persistent activity, complex tasks/pressure, [and] interacting with other individuals."[84]

The ALJ noted some support for Dr. Metoyer's opinions because he "not[ed] a tendency for the claimant to isolate himself with intact memory and adequate concentration and persistence. There is also some support in the doctor's findings for some limitations, such as difficulty performing serial 7s, and an affect congruent with the reported 'anxious, depressed, down' mood."[85] But the ALJ found Dr. Metoyer's opinions "not persuasive, particularly regarding . . . marked limitations," for the following reasons: (1) Dr. Metoyer's findings did not support limitations beyond moderate limitations in interactions because Plaintiff was cooperative and engaged during the evaluation, had goal-directed thought process, was fully oriented with intact memory, correctly spelled "world" forward and backward, and had no difficulty following the conversation; (2) the extent of limitations was not consistent with the overall evidence, "including

---

[84] AR 415.

[85] AR 709.

DISPOSITIVE ORDER - 28

normal appearance, being fully oriented, cooperative, normal speech, normal mood and affect, normal or intact memory, linear and goal-directed thought process, good concentration, and/or normal or good insight and judgment"; and (3) the extent of limitations was not consistent with Plaintiff's activities because he was a comic book artist who could shop for groceries and at a hobby shop, cook, clean, manage his own finances, use a cellphone to send text messages, and do household chores.[86]

###    3.    Thomas Genthe, PhD

On March 24, 2020, Dr. Genthe performed a psychological evaluation of Plaintiff by phone.[87] Dr. Genthe diagnosed Plaintiff with intermittent explosive disorder, major depressive disorder, other specified anxiety disorder, and other specified schizophrenia spectrum disorder.[88] Dr. Genthe opined that Plaintiff was moderately limited in

---

[86] AR 709.

[87] AR 512–19.

[88] AR 515.

DISPOSITIVE ORDER - 29

his ability to ask simple questions or request assistance.[89] Dr. Genthe opined that Plaintiff was markedly limited in the following activities: to communicate and perform effectively in a work setting; to maintain appropriate behavior in a work setting; and to complete a normal workday or workweek without interruption from psychological symptoms.[90] Dr. Genthe rated Plaintiff overall markedly impaired based on the combined impact of all diagnosed mental impairments.[91]

The ALJ noted "some support in [Dr. Genthe's] findings including a 'bored' mood, stating there are 48 weeks in a year, did not name the street he grew up on, and had poor social maturity."[92] But the ALJ found Dr. Genthe's opinions not persuasive for the following reasons: (1) they were not supported by "the many unremarkable exam findings," including normal grooming, speech, cooperation, reality and delusions testing, logic, thought process, memory, concentration,

[89] AR 515.

[90] AR 515.

[91] AR 516.

[92] AR 710.

DISPOSITIVE ORDER - 30

insight, and judgment; and (2) they were not consistent "with the overall evidence including normal appearance, being fully oriented, cooperative, normal speech, normal mood and affect, normal or intact memory, linear and goal-directed thought process, good concentration, and/or normal or good insight and judgment."[93]

### 4.    Joel C. Mitchell, PhD

On June 25, 2022, Dr. Mitchell performed a psychological evaluation of Plaintiff.[94] Dr. Mitchell diagnosed Plaintiff with "major depressive disorder, recurrent, mild, in partial remission"; and "other trauma- and stressor-related disorder: chronic, recurring adjustment disorders with low tolerance for distress."[95] Dr. Mitchell opined that Plaintiff would have "substantial difficulty" maintaining regular attendance and completing a typical workday or workweek without interruption from a psychiatric condition.[96]

---

[93] AR 710.

[94] AR 2813–19.

[95] AR 2817 (cleaned up).

[96] AR 2818–19.

DISPOSITIVE ORDER - 31

The ALJ found "no support in the record for substantial difficulty maintaining regular attendance."[97] The ALJ explained:

> The amount of time the claimant reported spending in bed, such as waking at 10:00 to take medicine, going back to sleep until around noon, intermittently sleeping/resting as needed, and returning to bed at 10:00-11:00, is not consistent with treatment records that do not describe this level of sleep as an ongoing issue. It also does not appear that the claimant obtained a suggested sleep study. The claimant's activities, including caring for his yard, dating and getting married during the relevant period, assisting his wife with homecare, painting, drawing daily, working out, training to be a wrestling coach, and involvement with a local WWE-type wrestling events suggest a greater range of daily activity and are not consistent with difficulties in attendance.[98]

### 5.    Greg Hires, LICSW

Mr. Hires, Plaintiff's therapist, wrote a treatment summary dated December 15, 2020.[99] Mr. Hires stated he saw Plaintiff eleven times since January 2020 for PTSD with symptoms of depression and anxiety.[100] Mr. Hires stated Plaintiff's behavior was "influenced by

---

[97] AR 710.

[98] AR 710.

[99] AR 3638.

[100] AR 3638.

delusions and debilitating flash backs"; "has serious impairment in communication and judgment"; "is sometimes incoherent and acts grossly inappropriate"; "is unable to function in most areas and sometimes spends the entire day in bed"; "is unable to work or perform basic life skills"; "dresses in a manner that accentuates his low internal functioning"; "[h]is disfunction includes social, financial, vocational, physical health and civic roles"; "has had trouble with punctuality and attendance due to his low functioning"; and has "lack of flexibility and inability to manage even the smallest of changes."[101]

Mr. Hires wrote an undated statement received in May 2024.[102] Mr. Hires stated Plaintiff had been in biweekly counseling for the prior 18 months.[103] Mr. Hires stated Plaintiff was "very depressed and unable to function in all major life roles"; had "a very disordered sleep

---

[101] AR 3638.

[102] AR 3273.

[103] AR 3273.

DISPOSITIVE ORDER - 33

condition due in part to PTSD"; and his "conditions are long term, even life long and require support in all areas of adult functionality."[104]

The ALJ found that Mr. Hires' opinions were not specific to Plaintiff's ability to function, but to the extent they represented opinions, they were not persuasive.[105] The ALJ noted that Plaintiff's representative confirmed at the hearing that the file does not contain treatment notes from Mr. Hires, so the ALJ was unable to determine whether Mr. Hires' opinions were supported by his findings.[106] Plaintiff's representative said they "requested records from [Mr. Hires] back in 2020 as well as in 2024. All that he produced for us were those two letters summarizing the treatment. . . . I'm not sure he really keeps detailed records, or he would've shared them with us. And that's why

---

[104] AR 3273.

[105] AR 712.

[106] AR 712.

he instead summarized the treatment . . . ."[107] The ALJ found Mr. Hires' opinions not consistent with "the overall evidence that describes a much higher level of functioning than is reported by Mr. Hires."[108] The ALJ referenced the same activities and normal mental-status exams as referenced when analyzing the other opinions.[109]

6.    Analysis

As shown, the ALJ found the opinions unpersuasive because they were not adequately supported by findings and were inconsistent with overall unremarkable mental-status exams and Plaintiff's activities. On this record, the mental-status exams and Plaintiff's activities are not inconsistent with every psychological examiner and Plaintiff's long-term therapist opining that Plaintiff would be more limited at work

---

[107] AR 770–71. *See also* AR 786–87 (Plaintiff's representative's understanding that Mr. Hires' practice "do[es] not record treatment notes like we would expect to find at most other counseling services.").

[108] AR 712.

[109] AR 712.

due to his depression, anxiety, PTSD, and mood-related disorders, so the ALJ's reasoning is not supported by substantial evidence.

Plaintiff visited the VA Medical Center or VA-referred clinics several times for primary and psychiatric care during the relevant period, and providers largely made the same normal mental-status findings as to Plaintiff's orientation and consciousness, appearance, grooming and hygiene, behavior, speech, eye contact, language, mood and affect, perceptual disturbance, thought process and association, thought content, cognition, insight, judgment, memory, and fund of knowledge.[110] So the ALJ did not misstate the record in identifying several unremarkable mental-status exams in the record. But those mental-status exams say little to nothing about Plaintiff's capacity for regular attendance, interacting with others, or completing tasks

---

[110] *E.g.*, AR 382, 450–51, 456, 474, 567, 2181, 2191–92, 2242, 2308–09, 2481, 2527, 2885, 2968, 3076, 3419, 3801, 4147, 4158.

DISPOSITIVE ORDER - 36

without psychological-based interruptions at work, particularly from his PTSD and mood-related disorders.[111]

The evidence that would be more logically relevant to such functional capacities suggests that Plaintiff is as limited as the psychological examiners opined.[112] For example, Plaintiff reported to the VA in October 2019 that he had suicidal thoughts after having a

---

[111] *See Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016) ("It is the nature of bipolar disorder that symptoms wax and wane over time."); *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.").

[112] *See Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (emphasizing that treatment records must be viewed considering the overall diagnostic record).

DISPOSITIVE ORDER - 37

good morning because he got angry seeing homeless people.[113] He reported to the VA in October 2020 "[g]oing through a lot of rage issues" with "extreme highs and lows" where he would have "[b]outs of great energy with rage" followed by feeling "really low" and wanting to sleep all the time.[114] The provider noted he was assessed with depression, anxiety, PTSD, and bipolar disorder and "seem[ed] to have weeks of severe depression where he sleeps 18 hours/day, amotivation, does not do anything, then will have a few weeks of what sounds like some hypomania of increased motivation, some rapid thinking, increased work, sometimes irritability, sometimes excessive talking."[115] Plaintiff's therapist, whom he seemingly saw every other week since 2020, reported that Plaintiff was impacted by debilitating flash backs, struggled with punctuality and regular attendance, acted inappropriately, could not manage small changes, had disordered sleep

---

[113] AR 454.

[114] AR 562.

[115] AR 567.

DISPOSITIVE ORDER - 38

from PTSD, and sometimes spent the entire day in bed.[116] Plaintiff reported to the VA in June 2024 that he had an "uncontrolled anger outburst last night that involved a sixteen year old minor from his neighborhood."[117] Plaintiff's wife had to "take his metal cane from him and extract him from the situation," the police were called, and Plaintiff and the minor "continued verbal threats."[118] He reported to the VA in July 2024 that he had recently became "suddenly angry and punched the wall," was irritable and had "verbal outbursts more often recently," and had difficulty "tolerating 'typical' noises."[119] He reported to the VA in September 2024 that he became "triggered" and irritable while waiting in the ER.[120] He reported similar mood instability, periods of severe depression, trauma and stress-related triggers, and

---

[116] AR 3272, 3638.

[117] AR 4167.

[118] AR 4167.

[119] AR 4153.

[120] AR 4146.

DISPOSITIVE ORDER - 39

outbursts to each psychological examiner.[121] All of these records are consistent with Plaintiff's testimony across four hearings, discussed above in the background section, and particularly his testimony that his mood cycles and difficulties with others impacted his functioning and attendance at prior jobs.[122]

As to daily activities, again, the ALJ did not misstate the record. As the ALJ found, Plaintiff performs household chores with mostly no issues, prepares meals, exercises regularly, manages his finances, and makes art. But the ALJ did not explain, and the Court does not see, how these activities, all of which Plaintiff does alone or with his wife, have anything to do with Plaintiff's capacity to maintain behavior, interactions, attendance, and persistence at work, even if limited to occasional interaction with the public, coworkers, and supervisors, considering his depression, PTSD, and mood-related disorders.[123]

---

[121] AR 412, 525, 2813–14.

[122] *See* AR 93–96, 101–03, 750, 752, 767–70, 818–25, 833–34.

[123] *See Diedrich v. Berryhill*, 874 F.3d 634, 643 (9th Cir. 2017) (recognizing that the fact the claimant "could participate in some daily

DISPOSITIVE ORDER - 40

Plaintiff had the relatively more social activities of shopping for groceries, shopping at a hobby store, and attending and assisting with wrestling events, but there is no evidence in the record of how Plaintiff's mood functioned in these activities and, in any event, they are not substantial evidence when three psychological examiners and Plaintiff's long-term therapist all opined consistent with the longitudinal record.

As to the opinions of Mr. Hires, the ALJ correctly explained that she could not evaluate whether his opinions were supported by his findings because the file did not contain his treatment notes, while also acknowledging that Mr. Hires explained the basis for his opinions in the summaries themselves. The ALJ also correctly parsed Mr. Hires' statements that did not meet the regulatory definition of a "medical

activities does not contradict the evidence of otherwise severe problems that she encountered in her daily life during the relevant period"); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace.").

DISPOSITIVE ORDER - 41

opinion" and those that did.[124] But substantial evidence does not support the ALJ's finding that Mr. Hires' opinions were inconsistent with the overall record because the ALJ gave the same reasons for finding them inconsistent as given for the psychological examiners' opinions.

Further, although the ALJ was not obligated to seek further information from Mr. Hires prior to making her at-issue decision,[125] evidence from Mr. Hires would be immensely helpful to the disability determination on remand. Plaintiff testified at the February 2025 hearing that he had been seeing Mr. Hires for mental-health counseling every other week for the past five or six years.[126] Mr. Hires'

---

[124] *See* 20 C.F.R. § 416.913 ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the abilities listed in paragraphs (a)(2)(i)(A) through (D) and (a)(2)(ii)(A) through (F) of this section.").

[125] *See Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001).

[126] AR 817–18. *See also* AR 770.

first summary states he saw Plaintiff 11 times in 2020 and Mr. Hires' second summary, seemingly from around May 2024, states Plaintiff had been in biweekly counseling for the prior 18 months.[127] The summaries and long treatment history demonstrate that Mr. Hires would know more about Plaintiff's mental functioning than any other provider or examiner in the record, and his knowledge would certainly be more pertinent than Plaintiff's mostly-solitary activities and snapshots of his mental status during other treatment appointments with questionable relevance to sustaining full-time work. Therefore, when updating and developing the record concerning Plaintiff's mental disorders on remand, the ALJ should consider whether additional information from Mr. Hires and/or an updated psychological consultative examination and/or medical-expert testimony will aid the sequential analysis.

**C.      Symptom Reports: The ALJ must reevaluate on remand.**

Plaintiff argues the ALJ failed to provide valid reasons for discounting the severity of his mental symptoms because the ALJ

---

[127] AR 3273, 3638.

DISPOSITIVE ORDER - 43

unduly relied on normal mental-status findings and his daily activities. The Court has already determined that remand is necessary because the normal mental-status exams and Plaintiff's activities are not substantial evidence of inconsistency between the overall record and the medical opinions. Plaintiff's subjective mental symptom reports align with his reports made to the psychological examiners and are consistent with the examiners' opinions. Therefore, just as the ALJ is to reevaluate the consistency of the medical opinions with the overall record, the ALJ is to reevaluate Plaintiff's subjective mental symptom reports.[128]

Finally, in one paragraph, Plaintiff argues the ALJ also erred in rejecting his subjective physical symptoms because, according to Plaintiff, the ALJ only recited a summary of medical evidence and did

---

[128] *See* 20 C.F.R. § 416.929(c); *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) ("When objective medical evidence is inconsistent with a claimant's subjective testimony, an ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear, and convincing reasons for doing so.") (cleaned up).

DISPOSITIVE ORDER - 44

not provide any reasons for rejecting his reports.[129] Although Plaintiff has already established a basis for remand, for completeness, the Court notes that Plaintiff is incorrect. In addition to her summary of the medical evidence, the ALJ reasoned based on normal physical-exam findings and daily activities demonstrating physical capacity that Plaintiff's subjective physical symptoms were inconsistent with the record.[130] Though these articulated reasons are brief, they are reasons nonetheless, and Plaintiff has not argued on appeal that any of the reasons provided are unconvincing as to his subjective physical symptoms.

---

[129] ECF No. 8 at 20. *See Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) ("[P]roviding a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible.").

[130] AR 704–05.

## IV.  Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process. When engaging in the five-step disability evaluation on remand, if the ALJ discounts a medical opinion based on a perceived inconsistency with the evidence, the ALJ should include sufficient explanation and citations to show that an inconsistency truly exists and why the inconsistency tends to undermine the medical opinion in question.[131] The ALJ should consider whether obtaining an updated psychological consultative examination and/or medical-expert testimony from someone qualified in PTSD and mood-related disorders is necessary. Similarly, if the ALJ discounts Plaintiff's reported symptoms, the ALJ must articulate clear and convincing reasons for discounting the identified symptoms and cite the evidence that undermines the symptoms.[132]

Accordingly, **IT IS HEREBY ORDERED**:

---

[131] *See* 20 C.F.R. § 416.920c(a)–(c).

[132] *Ghanim*, 763 F.3d at 1163.

DISPOSITIVE ORDER - 46

1. The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

2. The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 10**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 6th day of July 2026.

*Edward F. Shea*

EDWARD F. SHEA
Senior United States District Judge

DISPOSITIVE ORDER - 47